UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| QUINTA SANDERS | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MISSISSIPPI COUNTY, MISSOURI, | ) | Case No. |
| CITY OF CHARLESTON, MISSOURI, | ) | |
| CORY HUTCHESON, SALLY YANEZ, | ) | |
| RYAN HILL, JOE ROSS, | ) | **JURY TRIAL DEMANDED** |
| JOSH MALDONADO, | ) | |
| DECOTA MCGLOTHLIN, | ) | |
| FAITH ALTAMIRANO, | ) | |
| ROBERT HEARNES, | ) | |
| CURTIS ARNOLD, | ) | |
| ZACHARY MATNEY, and | ) | |
| AUSTIN HENSON | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Plaintiff, Quinta Sanders, and files this civil action against Defendants in their individual and official capacities, and would show:

## INTRODUCTION

1.     Plaintiff, Ms. Quinta Sanders, on behalf of all class beneficiaries of Tory D. Sanders (deceased) seeks judgment against Defendants for violations of Mr. Sanders' well-established civil rights under the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §§ 1983, 1985, and 1988; the Missouri Constitution; and

1

Missouri's false imprisonment, negligence, and wrongful death statutes, while acting under the color of law.

2.       Plaintiff Ms. Sanders also seeks judgment against Defendants for implicitly or explicitly adopting and implementing policies and/or customs that included, among other things, allowing officers and jailers with no or inadequate training to assess the medical conditions of arrestees/detainees/inmates, withhold or deny medical treatment to arrestees/detainees/inmates with serious medical needs, use unnecessary force on arrestees/detainees/inmates, fail to prevent or stop other jailers or officers from violating the civil rights of arrestees/detainees/inmates. These policies, customs, or practices and/or failure to have the same reflected a deliberate indifference to the Mr. Sanders' constitutional rights and, ultimately led to his in-custody death on May 5, 2017.

<u>**JURISDICTION AND VENUE**</u>

3.       This action is brought, in part, pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 for the deprivation of civil rights; jurisdiction is therefore appropriate under 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction pursuant to 42 U.S.C. § 1988 to award and allocate attorneys' fees which are specifically requested in this Complaint.

4.       This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.       The claims asserted herein arose in Mississippi County, Missouri, which is located in the Eastern District, Southeastern Division of this Court and, therefore, venue is proper under 28 U.S.C. § 1391(b) and (e) and E.D.Mo.L.R.. 3-2.07(B)(2).

## PARTIES

6.    Plaintiff Quinta Sanders is and, was at all times relevant, the natural mother of the decedent Tory D. Sanders (DOB: 10/30/1988).

7.    Plaintiff Ms. Sanders is an appropriate party to bring this action on behalf of all members of the class for wrongful death pursuant to R.S.Mo. § 537.080, including Thomas Douglas (father of decedent), Summer Barrett (wife of decedent), and decedent's nine minor children J.S. (DOB: 6/19/2015); Z.S. (DOB: 9/27/2016); T.S. (DOB:11/6/2010); J.T.C. (DOB: 3/14/2011); T.C.S. (DOB: 1/27/2012); T.H.S. (DOB: 2/13/2013); J.L.C. (DOB: 11/20/2014); D.B. (DOB: 3/4/2016); L.C. (DOB: 1/12/2018).

8.    Plaintiff Ms. Sanders has been appointed Administratrix of her late son's estate.

9.    Defendant Mississippi County, Missouri ("Mississippi County") is a political subdivision of the State of Missouri and operates the Mississippi County Detention Center ("MCDC"), a jail located in Mississippi County, Missouri.

10.    Defendant Mississippi County has control of the budget and authorization for deputies and jailers of the MCDC, who in turn control and operate the MCDC.

11.    Defendant Mississippi County is responsible for the wrongful death of Mr. Sanders, which was caused by the acts and/or failures to act of the duly appointed sheriff, deputies, jailers, and staff of the Mississippi County Sheriff's Office, who were acting under color of the law at the time, as well as the negligent acts and/or omissions of each and every other Defendant, who were employees and/or agents of Mississippi County, and were acting within their scope of employment.

12.     Defendant City of Charleston, Missouri ("Charleston") is a political subdivision of the State of Missouri and, provides law enforcement services through the Charleston Department of Public Safety ("CDPS").

13.     Defendant Charleston is the political subdivision of the State of Missouri that is responsible for the wrongful death of Mr. Sanders, which was caused by the acts and/or failures to act of the duly appointed officers of the CDPS, who were acting under color of law at the time, as well as the negligent acts and/or omissions of each and every other Defendant, who were employees and/or agents of Charleston, and were acting within their scope of employment.

14.     At all times material hereto, Defendant CORY HUTCHESON was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as the elected Sheriff of Mississippi County, employed by Defendant Mississippi County, and was acting under the color of law. CORY HUTCHESON is sued in both his individual and official capacities. As Sheriff, CORY HUTCHESON was the policymaker with respect to operations, general orders, and treatment of arrestees/inmates/detainees, and responsible for the daily operations of the MCDC and formed and adopted its customs.

15.     At all times material hereto, Defendant SALLY YANEZ was a citizen and resident of Mississippi County, Missouri, and was acting in her capacity as Jail Administrator of MCDC, employed by Defendant Mississippi County, and was acting under color of state law. She is sued in both her individual and official capacities. As Jail Administrator, SALLY YANEZ was the policymaker with respect to operations, general orders, and treatment of arrestees/inmates/detainees, and responsible for the daily operations of the MCDC and formed and adopted its customs.

4

16.     At all times material hereto, Defendant RYAN HILL was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as Mississippi County Deputy and employed by Defendant Mississippi County, and was acting under the color of law. He is sued in both his individual and official capacities.

17.     At all times material hereto, Defendant JOE ROSS was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as Jailer of MCDC, employed by Defendant Mississippi County, and was acting under the color of law. He is sued in both his individual and official capacities.

18.     At all times material hereto, Defendant JOSH MALDONADO was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as Jailer of MCDC, employed by Defendant Mississippi County, and was acting under the color of law. He is sued in both his individual and official capacities.

19.     At all times material hereto, Defendant DECOTA McGLOTHLIN was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as Jailer of MCDC, employed by Defendant Mississippi County, and was acting under color of law. He is sued in both his individual and official capacities.

20.     At all times material hereto, Defendant FAITH ALTAMIRANO was a citizen and resident of Mississippi County, Missouri, and was acting in her capacity as Jailer of MCDC, employed by Defendant Mississippi County, and was acting under the color of law. She is sued in both her individual and official capacities.

21.     Defendants Cory Hutcheson, Sally Yanez, Ryan Hill, Joe Ross, Josh Maldonado, Decota McGlothlin, and Faith Altamirano will be collectively referred to as "County Defendants."

22.     At all times material herein, County Defendants were employed and/or acted as agents of Defendant Mississippi County and acting under the color of law.

23.     At all times material hereto, Defendant ROBERT HEARNES was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as Director of Public Safety for CDPS, employed by Defendant Charleston, and was acting under color of law. He is sued in both his individual and official capacities. As Director of Public Safety, Defendant Hearnes was the policymaker for CDPS with respect to operations, general orders, and treatment of arrestees/inmates/detainees, and responsible for the daily operations of the CDPS and formed and adopted its customs.

24.     At all times material hereto, Defendant CURTIS ARNOLD was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as CDPS Officer, employed by Defendant Charleston, and was acting under color of law.  He is sued in both his individual and official capacities.

25.     At all times material hereto, Defendant ZACHERY MATNEY was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as CDPS Officer, employed by Defendant Charleston, Missouri and was acting under color of law. He is hereby sued in both his individual and official capacities.

26.     At all times material herein, Defendant AUSTIN HENSON was a citizen and resident of Mississippi County, Missouri, and was acting in his capacity as CDPS Officer, employed by Defendant Charleston, Missouri and was acting under the color of law.  He is sued in both his individual and official capacities.

27.     Defendants Robert Hearnes, Curtis Arnold, Zachary Matney, and Austin Henson will be collectively referred to as "City Defendants."

6

28.     At all times material herein, City Defendants were employed and/or acted as agents of Defendant City of Charleston.

29.     Defendant Mississippi County established and/or delegated to Defendants Hutcheson and/or Yanez and/or other employees the responsibility of establishing and implementing policies and customs of the MCDC regarding the use of force, medical care, medical screenings, safety screenings, medical monitoring, and basic care of each arrestee/detainee/inmate; and for implementing policies and customs for training other jailers and employees on the same.

30.     Defendant Charleston established and/or delegated to Defendant Hearnes and/or other employees the responsibility of establishing and implementing policies and customs regarding the use of force, medical care, medical screenings, safety screenings, medical monitoring, and basic care of each arrestee/detainee/inmate; and for implementing policies and customs for training other officers on the same.

31.     All acts and/or omissions which caused injury to and the death of Mr. Sanders occurred while he was in the custody of Defendant Mississippi County located in Charleston, Mississippi County, Missouri.

32.     All acts and/or omissions which caused injury to and the death of Mr. Sanders, occurred while he was in the custody of Defendant Charleston located in Mississippi County, Missouri.

33.     Each of the acts and/or omissions complained of herein which caused injury to and the death of Mr. Sanders occurred between May 4, 2017 and May 5, 2017, the date of his death, while he was in the care, custody and control of Defendant Mississippi County, County Defendants, Defendant Charleston, and City Defendants.

## FACTS

34.     On May 4, 2017, Mr. Sanders was driving from his home in Nashville, Tennessee and headed to Memphis, Tennessee when he got lost and ended up in Mississippi County, Missouri and encountered CDPS officers.

35.     On the morning of May 5, 2017, Defendant Matney arrived at the CDPS and was advised by officers from the night shift that he might have to deal with a subject who was lost and having problems with his wife.

36.     On the morning of May 5, 2017, Defendant Arnold arrived at the CDPS and was told that sometime during the previous day, CDPS officers had been involved with a person who got lost on his way to Memphis and ended up in Charleston.

37.     On the morning of May 5, 2017, Defendant Matney arrived at the Flying J gas station in Charleston, Missouri because of a complaint that a person, later identified as Mr. Sanders, wanted to turn himself in for a warrant.

38.     At approximately 9:41 a.m., Defendant Arnold was dispatched to the Flying J.

39.     Mr. Sanders approached Defendant Matney and told him that he had a federal warrant for arrest pending for "guns."

40.     While the officers waited for CDPS to confirm the alleged warrant, Defendants Arnold and Matney noticed that Mr. Sanders was acting paranoid, displaying mood swings, and believed that undercover officers and cameras were watching him.

41.     Defendant Arnold believed Mr. Sanders was "having thoughts that were not reality."

42.     Mr. Sanders told the officers that he needed "help" and requested to speak with a "mental doctor" for a "mental evaluation."

43.     Defendant Matney believed there was "something off" about Mr. Sanders.

44.     Officer Matney placed Mr. Sanders in handcuffs and Mr. Sanders said, "I need to see a mental health doctor to save my life and my kids life."

45.     It was confirmed that Mr. Sanders did have an outstanding warrant, but it was not for guns and was not extraditable.

46.     Mr. Sanders informed Defendants Arnold and Matney that he was a paranoid-schizophrenic and had been diagnosed with "BDD" and bipolar, schizophrenia disorder.

47.     Mr. Sanders told Defendants Arnold and Matney that he had taken medication in the past but was not currently taking anything.

48.     Defendants Arnold and Matney believed Mr. Sanders needed to see a counselor for a mental evaluation and took him into protective custody.

49.     Defendant Matney transported Mr. Sanders to the MCDC.

50.     Once at the MCDC, Officer Matney contacted the Missouri Crisis and Response System, which contacted Bootheel Counseling Services.

51.     Bootheel Counseling Services Counselor T.J. Feeler requested that Mr. Sanders be transported to the emergency room for the evaluation.

52.     Defendant Hearnes directed Defendant Matney to bring Mr. Sanders to the MCDC and not to the emergency room because CDPS did not have enough man power to accommodate Mr. Feeler's request.

53.     Mr. Feeler decided to drive to MCDC to perform the evaluation.

54.     Defendant Matney and Mr. Sanders arrived at the MCDC at approximately 10:14 a.m. and Mr. Sanders was placed in holding cell 120.

55.     Holding cell 120 has an opaque metal door with two small openings, including the "chuck hole" and the viewing window.

56.     The "chuck hole" is a small rectangular opening towards the bottom of the door that can be opened from the outside so that a food tray can be given to the detainee.

57.     The viewing window is a small rectangular steel mesh opening towards the top of the door that can be covered from the outside.

58.     Mr. Sanders was removed from holding cell 120 and Defendant Altamirano began filling out the Booking Report at approximately 11:00 a.m.

59.     Defendant Altamirano indicated on the Medical Questionnaire that Mr. Sanders was "currently" under a psychiatric disorder.

60.     Mr. Sanders was placed back in holding cell 120 at 11:07 a.m. and given a food tray through the "chuck hole" at approximately 11:58 a.m.

61.     Mr. Feeler arrived at approximately 12:07 p.m. and interviewed Mr. Sanders until 12:20 p.m.

62.     Mr. Feeler noted that the current primary presenting problem was "substance abuse"; that Mr. Sanders was suffering from paranoia; and that his judgment and insight were "poor."

63.     During the interview, Mr. Sanders reported he had used "a lot" of cocaine, alcohol, and marijuana six hours prior and had been diagnosed as bipolar and schizophrenic.

64.     Mr. Feeler noted that in the last 30 days Mr. Sanders suffered from hallucinations, delusions, illusions, and persistent stomach pain, and was disoriented to person, time, and place.

65.     Mr. Sanders told Mr. Feeler that he "need[ed] to get back on med[ications]" because he has not been on them for two months.

66.     Mr. Feeler noted that Mr. Sanders was "quite interesting" and recognized that there "was something different about Mr. Sanders."

67.     Mr. Feeler ultimately determined that Mr. Sanders was not a threat to himself or anyone else and released him back to law enforcement.

68.     Mr. Feeler told Defendant Matney and other CDPS officers that "he could see signs of mental health issues" and that "the rubber did not meet the road" but Mr. Sanders did not meet the criteria for hospitalization.

69.      Defendant Hearnes determined that Mr. Sanders needed to be released and Defendant Matney contacted the MCDC directing them to release Mr. Sanders.

70.     At approximately 12:54 p.m., Jailer Bobby Woods told Mr. Sanders he was going to prepare his release paperwork.

71.     Mr. Sanders was still inside holding cell 120.

72.     At approximately, 1:30 p.m., Mr. Sanders started crying in his holding cell, saying he wanted to know "what the real charges were."

73.     It was reported that Mr. Sanders was talking incomprehensibly and getting aggravated and belligerent.

74.     From 1:35 p.m. to 2:50 p.m., video surveillance of the hallway in front of holding cell 120 shows seven brief occasions (approximately fifteen minutes total) in which a jailer or officer walks by or up to Mr. Sanders' holding cell door.

75.     During one of these encounters, at 2:14 p.m., Defendant Altamirano is in the hallways aggressively points her finger at Mr. Sanders' door and closes the chuck hole.

76.     At approximately 3:09 p.m., Defendant Matney returned to speak with Mr. Sanders through the viewing window because it was reported that he had become more aggressive, yelling that he believed that he "was going to be raped and killed."

77.     From 3:15 p.m. to 3:44 p.m., surveillance video of the hallway in front of holding cell 120 shows that no one from MCDC checked on Mr. Sanders.

78.     At approximately 3:44 p.m. Sheriff's Deputy Brandon Caid arrived to check on Mr. Sanders because he was yelling "Deputy, don't let them kill me"; "The Mexicans are trying to kill me; it's Cinco de Mayo!"

79.     Deputy Caid spoke with Mr. Sanders through the viewing window for approximately sixteen minutes and appeared to display his cell phone to Mr. Sanders on a couple occasions.

80.     Upon information and belief, Mr. Sanders was formerly placed into protective custody again.

81.     At approximately 4:02 p.m., Mr. Feeler returned and attempted to speak with Mr. Sanders through the holding cell door for approximately three minutes.

82.     Mr. Feeler was unable to interview Mr. Sanders because he was yelling that "people were trying to kill him"; pleading and banging on his cell door; and refusing to speak with anyone.

83.     Mr. Feeler determined that Mr. Sanders was suffering an "acute psychiatric crises" and prepared the necessary paperwork to submit to the Court for an order to place Mr. Sanders on a 96-hour hold so that he could obtain a mental health evaluation and treatment.

84.     Mr. Feeler confirmed that Mr. Sanders was not trying to harm himself and confirmed that a hospital bed was available for Mr. Sanders at Popular Bluff Medical Center.

12

85.     It is unknown if Mr. Feeler's paperwork requesting a 96-hour hold was ever sent to the Court for approval.

86.     As of 6:05 p.m. (two hours after Mr. Feeler prepared the paperwork), the court had not received the paperwork.

87.     From approximately 4:10 p.m. to 4:28 p.m., Defendant Matney allowed Mr. Sanders to speak with Plaintiff Ms. Sander on Deputy Caid's cell phone.

88.     At approximately, 4:22 p.m. surveillance video shows Deputy Caid showing Mr. Sanders a piece of paper through the viewing window and then folding it up and putting it in his pocket.

89.     At approximately 4:44 p.m., surveillance video shows Defendant Yanez briefly spoke with Mr. Sanders through the viewing window with Defendant Matney present.

90.     At approximately 4:46 p.m., a tray of food is provided to Mr. Sanders through the chuck hole.

91.     Between 5:18 and 5:25 p.m., surveillance video shows Mr. Sanders reaching his hands through the chuck hole on several occasions.

92.     At approximately 5:36 p.m., surveillance video shows Defendant Maldonado banging on Mr. Sanders' cell door, aggressively speaking and pointing his finger at Mr. Sanders.

93.     As of 5:36 p.m., Defendant Maldonado did not know why Mr. Sanders was being held.

94.     At approximately 5:47 p.m., surveillance video shows Defendants Maldonado and McGlothlin approach Mr. Sanders' holding cell door and Defendant Maldonado point a TASER at Mr. Sanders through the chuck hole.

95.     Mr. Sanders reached through the chuck hole for the TASER and Defendant Maldonado jumped back.

96.     Surveillance video shows Defendants Maldonado and McGlothlin unsuccessfully attempt to force open the holding cell door.

97.     Surveillance video shows Defendant Altamirano approach with a TASER and kick the chuck hole door shut while Mr. Sanders' hands were reaching through them.

98.     During this time, Mr. Sanders was asking to be let out of the cell and banging on the door.

99.     At approximately 5:48 p.m., Defendant Altamirano kicked Mr. Sanders' holding cell door multiple times and then opened the chuck hole door.

100.    Surveillance video shows Mr. Sanders' reach through the chuck hole, and Defendant Altamirano discharge a TASER multiple times at Mr. Sanders through the chuck hole.

101.    At approximately 5:49 p.m., Defendants Ross and McGlothlin approach the cell door and Defendant Ross deploys a TASER multiple times through the chuck hole at Mr. Sanders.

102.    While the TASER was being reloaded, and Mr. Sanders' attempted to block the chuck hole with a blanket and his shirt.

103.    Surveillance video shows Defendant McGlothlin pull the blanket and shirt through the chuck hole and out of the holding cell.

104.    Surveillance video shows Defendant Ross discharge the TASER through the chuck hole again.

105.    At approximately 5:50 p.m., Defendant Maldonado placed a TASER through the chuck hole and pointed it at Mr. Sanders.

14

106.    Prior to deploying TASERs, the County Defendants were aware that Mr. Sanders was suffering from a mental disturbance, yet they chose to use TASERS and other excessive force on him while he was unarmed, defenseless, and non-threatening.

107.    Defendant Ross continued to point a TASER through the chuck hole and the cell door viewing window for several minutes.

108.    At approximately 5:53 p.m., Defendant Ross stuck a TASER in the chuck hole and discharged it towards Mr. Sanders.

109.    At approximately 5:54 p.m., Nurse Emily Brown walked by Mr. Sanders' door but provided no medical assistance.

110.    At approximately 5:55 p.m., Defendant Ross pointed a TASER at Mr. Sanders.

111.    At approximately 5:55 p.m., Defendants Ross, Altamirano, Maldonado, and McGlothlin start preparing to enter Mr. Sanders' holding cell, wearing protective vests and holding restraints.

112.    At approximately 6:01 p.m., Defendant Hill entered the jail and was considered the person in charge.

113.    At approximately 6:08 p.m., Defendants Hill, Ross, McGlothlin, and Altamirano push the holding cell door partly open and Defendants Ross and Altamirano point a TASER directly at Mr. Sanders inside the cell.

114.    Nurse Brown is overheard on her cell phone video stating her belief that Mr. Sanders was "obviously" suffering from psychiatric problems.

115.    MCDC employees then request Oleoresin Capsicum spray (pepper spray) from the CDPS and Defendant Arnold arrived with it at approximately 6:11 p.m.

15

116.    Defendants Henson, Matney, and Arnold responded and observed that Mr. Sanders was in a "manic" state; beating on the inside of the cell door; and yelling "Help"; "They are trying to kill me"; "They are trying to electrocute me" and "They are trying to burn me."

117.    Defendants Henson, Matney and Arnold were told that Mr. Sanders had already been TASED multiple times "because he had assaulted Defendant Maldonado."

118.    The reason given for deploying the TASER was retaliation and punishment.

119.    Surveillance video shows Mr. Sanders grab a set of keys from Defendant Altamirano's hands through the chuck hole.

120.    At approximately 6:12 p.m., Defendant Hill deployed the pepper spray into Mr. Sanders' cell.

121.    The pepper spray was expired.

122.    The officers and jailers go outside for fresh air.

123.    The pepper spray caused Defendant Matney's nose to bleed.

124.    Mr. Sanders covers the viewing window with some kind of cloth.

125.    The jailers and officers leave Mr. Sanders in the holding cell, and he is provided no medical attention.

126.    While outside Defendants Hill, Arnold, Matney, Maldonado, and Henson stated their belief that they should just leave Mr. Sanders alone and not attempt to make entry into the cell so that he could calm down.

127.    Defendants Matney and Arnold discussed their belief that Mr. Sanders was possibly suffering from a medical condition called "excited delirium."

16

128.    Defendant Henson's training was that they should not enter the cell or invade Mr. Sanders' space given Mr. Sanders' state of mind and entering the cell would escalate the situation.

129.    Defendant Hill discussed using a "flash bang" to stun Mr. Sander so the officers could enter his cell.

130.    At approximately 6:17 p.m., surveillance video shows Defendants wearing helmets and holding a body shield.

131.    From 6:19 p.m. to 7:06 p.m., surveillance video shows various jailers and officers approach Mr. Sanders' cell door and appear to speak with him.

132.    At approximately 7:09 p.m. surveillance video shows Defendants Yanez and Hutcheson arrive.

133.    It was reported that Defendant Hutcheson made some unnecessary verbal "jabs" towards Mr. Sanders.

134.    Defendant Hutcheson's law enforcement license was suspended, and he was only permitted to act as an administrator of the department.

135.    Defendant Hutcheson was not permitted to interact with Mr. Sanders.

136.    Defendant Hutcheson directed everyone to enter the holding cell with him, and Defendant Arnold suggested that the group enter as soon as Mr. Sanders stepped away from the cell door so that Mr. Sanders' momentum along with the manpower would back him up.

137.    Mr. Sanders was at all times unarmed; he had not threatened harm to himself or to others; and was not a danger to himself or to others.

138.    At approximately 7:18 p.m., Defendants Hutcheson, Hill, Arnold, Matney, Henson, Ross, Maldonado, McGlothlin, and Yanez rushed into the holding wearing helmets, vests, and holding a large shield.

139.    Defendant Altamirano was outside the holding cell assisting the group.

140.    No verbal commands were given to Mr. Sanders when Defendants first entered the cell.

141.    Mr. Sanders was not wearing a shirt and his body was wet.

142.    Defendant Hill began to "drive stun" Mr. Sanders with a TASER.

143.    Defendant Matney slipped on the floor and hit his head on the wall.

144.    When Defendant Matney got to his feet, he saw Mr. Sanders on the bench with a lot of people on top of him.

145.    Mr. Sanders got to his feet and Defendant Matney struck him three times in the upper torso with his knee.

146.    Defendant Henson got one handcuff on Sanders, struck Mr. Sanders in the face five or six times with a closed fist, and placed one of Mr. Sanders' leg in a restraint.

147.    Defendant Matney was located at Mr. Sanders' right arm and struck Mr. Sanders in the face with a closed fist.

148.    Defendant Arnold struck Mr. Sanders in the face with a closed fist three of four times.

149.    Defendant Arnold was on the left side of Mr. Sanders' body near the shoulder and placed a handcuff on his right wrist.

150.    Defendant Ross grabbed Mr. Sanders' right arm and had it behind his back and then wrestled him over to the bunk.

151.    Defendant Ross was getting dry stunned repeatedly with a TASER.

152.    Defendant Arnold requested another pair of leg irons so he could cuff the leg irons and the two pair of handcuffs on Mr. Sanders' wrist together.

153.    Defendant Hutcheson was located at Mr. Sanders' head and repeatedly attempted to "dry stun" him.

154.    Mr. Sanders was screaming "Stop" and that they were trying to kill him.

155.    Defendant Ross grabbed Mr. Sanders' legs, causing him and Mr. Sanders to fall to the ground "with a large number of people laying on top of" Mr. Sanders.

156.    Defendant Arnold described the scene as a "dog pile."

157.    Mr. Sanders was laying on his left side, twisted at the hip, with both of his shoulders on the ground.

158.    Defendant Matney was lying across Mr. Sanders' mid-section.

159.    Mr. Sanders' body went limp and the officers and jailers secured him with handcuffs in front of his body and the leg cuffs were secured.

160.    Mr. Sanders was not resisting.

161.    Defendant Matney believed that Mr. Sanders was unconscious at this time.

162.    Even though Mr. Sanders was not resisting, Defendants were still holding Mr. Sanders' down.

163.    At the direction of Defendant Arnold, Defendant Yanez started applying pressure to Mr. Sanders' neck and Mr. Sanders' closed his eyes and passed out.

164.    Defendant Yanez observed blood coming from Mr. Sanders' mouth.

165.    Defendant Yanez admitted to pushing "real hard" against Mr. Sanders' neck until she knew he was passed out.

19

166.    Defendant Yanez had no training on pressure point techniques.

167.    Defendant Hutcheson's left knee was applying pressure on the right side of Mr. Sanders' neck and temple and his hand was on Mr. Sanders' face.

168.    Defendant Arnold told Defendant Hutcheson to let the pressure off Mr. Sanders' neck at least three times and Defendant Hutcheson responded "No, I'm good."

169.    Mr. Sanders was not resisting when Defendant Yanez was applying pressure to his neck area.

170.    Mr. Sanders was not resisting when Defendant Hutcheson was applying pressure to his neck.

171.    Mr. Sanders was not a threat at the time when Defendants Hutcheson and Yanez were applying pressure to his neck.

172.    There was no need for Defendants Hutcheson and Yanez to apply pressure to Mr. Sanders' neck.

173.    Mr. Hutcheson applied pressure to Mr. Sanders' neck for at least one to three minutes after Mr. Sanders' stopped moving.

174.    After Mr. Sanders was handcuffed, Defendant Arnold could not tell if Mr. Sanders was breathing or if he had a pulse.

175.    Defendant Arnold was trained that someone suffering from excited delirium can die from being restrained.

176.    Defendant Arnold left the holding cell to attend to the other officers.

177.    Defendant Matney believed that Mr. Sanders may have had excited delirium and put his gloved hand toward Mr. Sanders' nose and believed he felt warm exhaled air.

178.    Defendant Matney felt Mr. Sanders stomach and noticed it was not moving.

179. Mr. Sanders was rolled onto his back.

180. After it was discovered that Mr. Sanders was not breathing, no life saving measures were taken.

181. From approximately 7:18 p.m. until 7:29 p.m. multiple jailers and officers entered and left the holding cell.

182. Defendant Hutcheson announced that he was going to uncuff Mr. Sanders when the ambulance arrived since Mr. Sanders "was not under arrest."

183. Defendant Hutcheson instructed county employees that they were not to speak with investigators about the incident.

184. At approximately 7:32 p.m., emergency medical technicians entered the jail.

185. At approximately 7:34 p.m., a stretcher is rolled into the cell and Mr. Sanders' body is rolled out at 7:36 p.m.

186. Mr. Sanders was pronounced dead at 8:08 p.m., and the manner of death was listed as homicide, "likely due to excited delirium syndrome."

187. Before entering the cell, Defendants had no plan of action.

188. Defendants did not intend to administer any medications designed to reduce mental distress once Mr. Sanders was restrained.

189. Defendant Henson did not know what the goal was in entering the cell.

190. Defendant Arnold admitted that bad tactics may have been used during the altercation with Mr. Sanders.

191. Defendant Yanez admitted that she put too much pressure on Mr. Sanders' neck which caused him to pass out.

21

192.    At no time prior to entering the cell did Defendant Maldonado believe that anyone's life was in danger.

193.    After the altercation, Defendant Yanez retrieved items out of Defendant Hutcheson's office and gave them to him.

194.    Defendant Hutcheson requested that Defendant Yanez retrieve an encrypted hard drive from his office.

195.    Defendant Hutcheson gave Defendant Yanez $60.00 to purchase a SIM card so that he could have a private text message conversation with her.

196.    Defendant Hutcheson assured Defendant Yanez that if she went to jail, he would help her get out.

197.    TASERs should not be used repeatedly on a person because it increases a person's chances of death.

198.    The use of pepper spray and TASERs should not be used on individuals suffering from mental disturbance.

199.    The chuck hole should only be used for feeding an inmate and not used as a means to deploy a TASER into a cell.

200.    County Defendants were not properly trained on the use of pepper spray and/or TASERs.

201.    At all relevant times, Mr. Sanders suffered from an objectively serious medical need that was so obvious that even a layperson would easily recognize the necessity for medical attention.

202.    Defendants were aware that Mr. Sanders had an objectively serious medical need as it was obvious based on his physical condition, information provided by Mr. Sanders and

family members of Mr. Sanders, Mr. Feeler, and Defendants' observations and comments about his condition.

203.    Defendants knew of the need for medical attention, yet, Defendants disregarded it.

204.    Defendants individually and in concert with one another intentionally, willfully, maliciously and/or recklessly, and while acting under the color of state law, showed a deliberate indifference to Mr. Sanders' serious needs, including medical needs and intervention, in that they had actual knowledge of his severe emotional disturbance or mental illness and did not provide any and/or sufficient medical treatment or contact anyone who could provide proper and/or adequate medical treatment.

205.    Defendants individually and in concert with one another intentionally, willfully, maliciously and/or recklessly, and while acting under the color of state law, showed a deliberate indifference to Mr. Sanders' constitutional rights in that they used excessive force by deploying TASERs and pepper spray through the chuck hole and other places in an effort to restrain Mr. Sanders who was unarmed and non-threatening.

206.    Defendants individually and in concert with one another intentionally, willfully, maliciously and/or recklessly, and while acting under the color of state law, showed a deliberate indifference to Mr. Sanders' constitutional rights in that they used excessive force to restrain Mr. Sanders, that ultimately led to his death.

207.    Defendants individually and in concert with one another through the policies and customs instituted by them fostered an environment which led to the deliberate indifference of Mr. Sanders' serious needs in contravention of his civil rights.

208.    Defendants individually and in concert with one another through the policies and customs instituted by them fostered an environment which led to the use of excessive force on Mr. Sanders' in contravention of his civil rights.

209.    Defendant Mississippi County was negligent in their supervision and training of the County Defendants.

210.    Defendant Charleston was negligent in their supervision and training of the City Defendants.

211.    Each of the Defendants, individually and in concert with one another, acted under the color of state law in both his/her individual and official capacities to deprive Mr. Sanders of his right to adequate and/or proper care, including medical and mental health care.  This is a right secured to Mr. Sanders by the 4th, 8th and 14th Amendments of the U.S. Constitution and by 42 U.S.C §1983.

212.    Defendant Mississippi County has a custom and policy of failing to provide adequate medical care.

213.    This custom and policy was the moving force behind the violation of Mr. Sanders' constitutional rights.

214.    Defendant Charleston has a custom and policy of failing to provide adequate medical care.

215.    This custom and policy was the moving force behind the violation of Mr. Sanders' constitutional rights.

216.    Defendant Mississippi County failed to implement adequate policies and/or customs to address arrestee/detainee/inmate medical concerns, medical surveillance, and detection of serious medical conditions.

217.    Defendant Mississippi County failed to implement adequate policies and customs to address the use of force.

218.    Defendant Charleston failed to implement adequate policies and/or customs to address arrestee/detainee/inmate medical concerns, medical surveillance, and detection of serious medical conditions.

219.    Defendant Charleston failed to implement adequate policies and/or customs to address the use of force.

220.    At the time Mr. Sanders was stopped, detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, Mr. Sanders was not committing a crime and was unarmed.

221.    At the time Mr. Sanders was stopped, detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, Mr. Sanders was not a harm to himself or the jailer and officers.

222.    At the time Mr. Sanders was stopped, detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, Mr. Sanders was not making a threatening gesture.

223.    At the time Mr. Sanders was stopped, detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, Mr. Sanders was suffering from an objectively obvious medical condition and mental illness.

224.    At the time Mr. Sanders was stopped, detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, Defendants failed to communicate orders, instructions, and directions to Mr. Sanders.

225.    At the time Mr. Sanders was detained, taunted, threatened, TASED, pepper sprayed, beaten, terrorized, forcefully restrained, punched, kneed, "dog piled," and choked, he was pleading for help and struggling to stay alive.

226.    As a direct and proximate result of the intentional and/or negligent, and/or grossly negligent, and/or reckless acts of all Defendants, Plaintiff and all the wrongful death beneficiaries suffered the loss of Mr. Sanders.

227.    As a direct and proximate result of the intentional and/or negligent, and/or grossly negligent, and/or reckless acts of all Defendants, Mr. Sanders suffered conscious pain and suffering before his death, including but not limited to a deterioration of his condition, severe anxiety and distress, severe mental anguish, and all said conditions led to high levels of anxiety and anguish, and these conditions caused him great physical pain and mental suffering prior to his death.  Defendants' deliberate indifference to the serious medical needs and use of excessive force caused Mr. Sanders' condition to worsen and exacerbated his condition, causing him great physical pain and mental anguish.

228.    As a direct and proximate result of the actions of all Defendants described above and pursuant to Mo. Rev. Stat. 537.090, Plaintiff has been damaged as follows: damages that decedent Mr. Sanders suffered between the time of his detention to the time of his death, and for the recovery of which the decedent might have maintained an action had death not ensued; pecuniary loss suffered by reason of the death of Mr. Sanders; funeral expenses; and a reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and the support of which Plaintiff and the other class beneficiaries have been deprived by reason of the death of Mr. Sanders.

229.   As a direct and proximate result of the Defendants' deliberate indifference to decedent Mr. Sanders' serious medical needs and use of excessive force, the decedent suffered the loss of life, and with it the loss of future income and enjoyment of life.

230.   All of the aforementioned actions demonstrate that Defendants' actions were reckless and/or callously indifferent to Mr. Sanders' rights so as to justify consideration by the trier of fact of aggravating circumstances in determining the amount of damages to be allowed.

231.   Beneficiaries are entitled to compensation for violations of Mr. Sanders' constitutional rights that all Defendants inflicted upon him, including but not limited to all damages allowable for wrongful death pursuant to R.S.Mo. § 537.080; pain and suffering before death; attorneys' fees; and punitive damages.

232.   Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

## CAUSES OF ACTION

### COUNT 1:
### Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 – City Defendants

233.   Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

234.   Mr. Sanders had objectively serious medical needs from the time City Defendants first contacted him at Flying J gas station.

235.   Mr. Sanders' medical need was so obvious that even a layperson would easily recognize the need for medical attention.

236.     Mr. Sanders' serious medical need was apparent by his actions outlined above and by the fact that Defendants Arnold and Matney indicated that when they first approached Mr. Sanders he was acting paranoid and seemed to be "a little off."

237.     Mr. Sanders asked Defendants Arnold and Matney if he could be seen by a medical doctor "to save [his] life and [his] kids life."

238.     Mr. Sanders also told Defendants Arnold and Matney that he had been diagnosed with "BDD" and bipolar and schizophrenia disorder.

239.     Mr. Sanders' serious medical need was apparent by his actions outlined above and by the fact that Defendants Arnold and Matney took Mr. Sanders into protective custody and requested a mental health evaluation.

240.     Despite Mr. Sanders' obvious signs of a severe mental illness, City Defendants failed to provide him medical care and/or adequate medical care.

241.     Instead, City Defendants took him to the county jail to be locked up.

242.     A reasonable officer would have understood that failing to seek medical care for one who exhibited the signs of Mr. Sanders would violate his constitutional rights.

243.     City Defendants deliberately and/or recklessly disregarded Mr. Sanders' objectively serious medical needs.

244.     Given Mr. Sanders' condition, a reasonable officer in City Defendants' positions would have understood that failing to get him medical care violated his constitutional right.

245.     City Defendants assisted County Defendants in deliberately disregarding Mr. Sanders' objectively serious medical needs by refusing to initiate life saving measures.

246.    Mr. Sanders had a clearly established Eighth Amendment right to be protected from the unnecessary and wanton infliction of pain and the use of excessive force by City Defendants.

247.    Jail detainees have a clearly established right to be free from TASER shock or its equivalent in the absence of a security threat pursuant to *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993).

248.    A basis for an Eighth Amendment claim exists when an officer or jailer uses pepper spray without warning on an inmate who may have questioned an officer or jailer's actions but who otherwise pose no threat pursuant to *Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002).

249.    None of the force used by City Defendants was used in a good faith effort to maintain or restore discipline.

250.    Instead, all of the force used by City Defendants was malicious and sadistic and used to harm and inflict pain and suffering.

251.    There was no objective need for force when Mr. Sanders was in the holding cell.

252.    Alternatively, if there was an objective need for force, the amount of forced used was grossly disproportionate to the amount of force needed.

253.    City Defendants were not under any threat of harm when they used the above-mentioned excessive force.

254.    City Defendants failed to temper the severity of the force used.

255.    City Defendants failed to intervene to prevent the acts and use of excessive force by each other and by the County Defendants, when they had the opportunity to do so, in violation of the U.S. Constitution.

256.   City Defendants assisted County Defendants in deliberately disregarding Mr. Sanders' constitutional rights by providing pepper spray to County Defendants and by spraying expired pepper spray into Mr. Sanders' holding cell; by failing to provide any medical treatment to Mr. Sanders after the use of the pepper spray.

257.   City Defendants assisted County Defendants in using excessive force by inflicting bodily harm upon Mr. Sanders by taunting him, threatening bodily injury, charging into his holding cell, subjecting him to TASER shocks, beating him, forcefully restraining him, punching him, kneeing him, choking him, and, ultimately, killed him.

258.   The act of supplying and using pepper spray was punitive, arbitrary, and malicious.

259.   It is well established that the malicious and sadistic use of force by a jail official or officer and against a detainee, done with the intent to injury and causing actual injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment clause.

260.   At no time prior to the City Defendants entry into the holding cell, did Mr. Sanders' noncompliance pose a threat to other persons or to prison security.

261.   There were no compliance orders given to Mr. Sanders when the City Defendants were in the holding cell with Mr. Sanders.

262.   In the event there were compliance orders given while the City Defendants were in the holding cell, there became a time when there was no threat of harm and excessive force continued to be used.

263.   In committing the acts complained of herein, Defendants acted under color of state law to show deliberate indifference to Mr. Sanders' constitutional rights.

264.   City Defendants violated General Order 2007-027.

265.    General Order 2007-027 is ministerial in nature.

266.    City Defendants violated General Order 2007-012.

267.    General Order 2007-012 is ministerial in nature.

268.    As a direct and proximate result of the violation of Mr. Sanders' constitutional rights by the City Defendants, Mr. Sanders suffered general and special damages as alleged in the Complaint and is herein entitled to relief under 42 U.S.C. §1983.

269.    Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages, damages for aggravating circumstances and punitive damages in an amount of not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

## COUNT 2:
## Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 – County Defendants

270.    Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

271.    Mr. Sanders had objectively serious medical needs from the time he was in the care, custody and control of County Defendants.

272.    Mr. Sanders' medical need was so obvious that even a layperson would easily recognize the need for medical attention.

31

273.    Mr. Sanders' serious medical need was apparent by his actions outlined above and the fact that Defendants Arnold and Matney communicated their concern regarding Mr. Sanders' medical needs to County Defendants.

274.    Mr. Sanders' serious medical need was apparent by his actions outlined above and by the fact that while he was being booked, Defendant Altamarino indicated on the Medical Questionnaire that Mr. Sanders was "currently" under a psychiatric disorder.

275.    Mr. Sanders was showing obvious signs of a severe mental illness, requiring medical attention, including hallucinating, yelling for help, speaking incomprehensibly, and slamming his holding cell door shut.

276.    Despite Mr. Sanders' obvious signs of a severe mental illness, County Defendants failed to provide him medical care and/or delayed in requesting and/or finding Mr. Sanders adequate medical care.

277.    A reasonable officer or jailer would have understood that failing to seek medical care for one who exhibited the signs of Mr. Sanders would violate his constitutional rights.

278.    County Defendants deliberately disregarded Mr. Sanders' objectively serious medical needs.

279.    Given Mr. Sanders' condition, a reasonable officer and jailer in County Defendants' positions would have understood that failing to get him medical care violated his constitutional right.

280.    County Defendants assisted City Defendants in deliberately disregarding Mr. Sanders' objectively serious medical needs by refusing to initiate life saving measures.

281.     Mr. Sanders had a clearly established Eighth Amendment right to be protected from the unnecessary and wanton infliction of pain and the use of excessive force by County Defendants.

282.     Jail detainees have a clearly established right to be free from TASER shock or its equivalent in the absence of a security threat pursuant to *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993).

283.     A basis for an Eighth Amendment claim exists when an officer or jailer uses pepper spray without warning on an inmate who may have questioned an officer or jailer's actions but who otherwise pose no threat pursuant to *Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002).

284.     None of the force used by County Defendants was used in a good faith effort to maintain or restore discipline.

285.     Instead, all of the force used by County Defendants was malicious and sadistic and used to harm.

286.     There was no objective need for force when Mr. Sanders was in the holding cell.

287.     Alternatively, if there was an objective need for force the amount of forced used was grossly disproportional to the amount of force needed.

288.     County Defendants were not under any threat of harm when they used the above-mentioned excessive force.

289.     County Defendants failed to temper the severity of the force used.

290.     County Defendants failed to intervene to prevent the acts and use of excessive force by each other and by the City Defendants, when they had the opportunity to do so, in violation of the U. S. Constitution.

291.    County Defendants deliberately disregarded Mr. Sanders' constitutional rights by spraying expired pepper spray into Mr. Sanders' holding cell; by failing to provide any medical treatment to Mr. Sanders after the use of the pepper spray.

292.    County Defendants used excessive force by inflicting bodily harm upon Mr. Sanders by taunting him, threatening bodily injury, charging into his holding cell, subjecting him to TASER shocks, beating him, forcefully restraining him, punching him, kneeing him, "dog piling" him, choking him, and, ultimately, killed him.

293.    The use of pepper spray and TASER shocks were punitive, arbitrary, and malicious.

294.    It is well established that the malicious and sadistic use of force by a jail official or officer and against a detainee, done with the intent to injury and causing actual injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment clause.

295.    At no time prior to the County Defendants entry into the holding cell, did Mr. Sanders' noncompliance pose a threat to other persons or to prison security.

296.    There were no compliance orders given to Mr. Sanders when the County Defendants were in the holding cell with Mr. Sanders.

297.    In the event there were compliance orders given while the County Defendants were in the holding cell, there became a time when there was no threat of harm and excessive force continued to be used.

298.    In committing the acts complained of herein, Defendants, acting under color of state law, showed deliberate indifference to a serious medical need and to the substantial risk of death to Mr. Sanders after having actual knowledge of such need for care, and in deprivation of

Mr. Sanders' rights under the Due Process Clause of the 14th Amendment of the U. S. Constitution.

299.   County Defendants violated MCDC Policy & Procedure Access to Medical Care and Use of Force.

300.   These policies were ministerial in nature.

301.   As a direct and proximate result of the violation of Mr. Sanders' constitutional rights by the City Defendants, Mr. Sanders suffered general and special damages as alleged in the Complaint and is herein entitled to relief under 42 U.S.C. §1983.

302.   Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages, damages for aggravating circumstances and punitive damages in an amount of not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

## COUNT 3:
## Violation of Civil Rights Pursuant to Title 42 U.S.C. §1983
## (Municipal Liability)

303.   Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

304.   On May 5, 2017, Mr. Sanders was an arrestee/detainee at the CDPS, where he came under the care, custody, and control of Defendant Charleston, during which time, and at all

times, he was in serious need of care, including mental health care, a fact which Defendant, through its agents and employees knew.

305.    Defendant Charleston has a continuing, widespread, and persistent pattern of unconstitutional misconduct by its officers.

306.    Defendant Charleston and its policymakers have notice of the unconstitutional misconduct and demonstrate a deliberate indifference to or tacit authorization of such unconstitutional misconduct.

307.    Defendant Charleston has a custom of failing to identify the need for medical care, failing to provide medical care, and ignoring clear signs of mental illness.

308.    Defendant Charleston has a custom of using excessive force and permitting and authorizing others to use excessive force in its officer's presence.

309.    Upon information and belief, Defendant Hearnes, as Director of Public Safety is the highest ranking CDPS official, had direct management supervision over the CDPS staff and was responsible for setting and implementing policy with respect to the CDPS.   In the alternative, Defendant Hearnes was inadequately trained and supervised by Defendant Charleston.

310.    Defendant Charleston *via* Defendant Hearnes failed to train, supervise, and retain CDPS staff, including Defendants Arnold, Matney, and Henson, and failed to supervise in a manner which deprived Mr. Sanders of his constitutional rights.

311.    Defendant Hearnes instructed Defendant Matney that he could not bring Mr. Sanders to the hospital for a mental health evaluation, despite a medical professional's opinion that Mr. Sanders be taken to the hospital.

312.    These customs exhibit a deliberate indifference to the constitutional rights of arrestees/detainees/inmates, including Mr. Sanders.

313.    Since November 2011, there has been at least one other allegation in which CDPS officers used excessive force on an unarmed individual, causing the individuals death.

314.    On November 8, 2011, CDPS officers arrived at the home of an African American man with developmental difficulties, chased the man out of his home, TASED him in the street, and shot him twice as he laid on the ground.

315.    Since May 2015, there has been at least one other occasion in which it was alleged that Defendant failed to provide medical care when an arrestee/detainee required it.

316.    On May 2, 2015, CDPS officers arrested a young lady for driving under the influence of drugs.

317.    CDPS officers failed to provide medical attention and it was alleged that this failure caused the young lady's death.

318.    Alternatively, Defendant's failure to have an appropriate policy exhibits a deliberate indifference to the constitutional rights of arrestees/detainees/inmates, including Mr. Sanders.

319.    Defendant Charleston developed General Order 2007-012 – "Use of Force" which is grossly inadequate and ignores constitutional rights.

320.    Said Order provides general statements on the use of force and provides no specific guidance for situations in which they are called to assist another agency.

321.    Said Order also primarily deals with the discharge of a weapon and ignores most other uses of force.

322.    Said Order fails to provide information about deescalating a crisis or resolving situations before the use of force is necessary.

323.    Defendant Charleston developed General Order 2007-027 – "Medical Bills" which is grossly inadequate and ignores constitutional rights.

324.    Said Order specifically deals with the costs of medical treatment, rather than the providing of medical treatment.

325.    Said Order fails to provide any direction on how to identify a person suffering from a medical crisis, mental illness or psychosis.

326.    Said Order provides that a person in police custody will be transported by ambulance or other private vehicle for medical treatment.

327.    To the extent these policies are adequate, City Defendants failed to follow their own policies, in that:

    a.    They failed to transport Mr. Sanders immediately to the hospital when it was requested by a medical professional.

    b.    They failed to approach Mr. Sanders in a manner that would resolve the situation.

    c.    They failed to make every reasonable attempt to generate voluntary compliance.

    d.    They failed to make any verbal commands while in the holding cell and attempting to restrain Mr. Sanders.

    e.    Mr. Sanders did not pose an immediate threat to the safety of officers or others, he was not involved in a serious crime, and was not attempting to resist arrest or evade arrest.

  f.  There was no need for any use of force, thus, the pepper mace should not have been used pursuant to the policy that states: pepper mace may only be used where higher levels of force are not necessary and lower levels of force would be ineffective.

  g.  Mr. Sanders was not being arrested and thus no force should have been used.

  h.  They failed to inform Defendant Hearnes that they intended to use force.

  i.  And in other ways which will be discovered during this litigation.

328. Upon information and belief, Defendant Charleston appointed and/or commissioned officers, who were not a licensed and/or adequately trained medical professionals, to screen the needs, including medical needs of arrestees/detainees in the custody of CDPS.

329. At the time of the above-described series of events it was the custom or policy of Defendant Charleston to inadequately supervise and train its officers with arrestees/detainees suffering from mental illness, thereby evidencing a deliberate indifference to Mr. Sanders' constitutional rights.

330. The need for training CDPS staff on the rights of arrestees/detainees with mental illness is obvious, and the lack of training was so inadequate that it was likely to result in violating the rights of individuals with mental illnesses, including Mr. Sanders.

331. The officers of Defendant Charleston conspired with one another and the County Defendants to cover for or protect one another from criminal and/or civil sanctions that might arise from the violation of constitutional rights.

332. In committing the acts complained of herein, Defendant acted under color of state law to show deliberate indifference to a serious medical need and to the substantial risk of death

by Mr. Sanders after having actual knowledge of such need for care, including medical care, and in deprivation of Mr. Sanders' rights under the Due Process Clause of the 14th Amendment of the United States Constitution.

333.    As a direct and proximate result of the violation of Mr. Sanders' constitutional rights by the Defendant, Mr. Sanders suffered general and special damages as alleged in the Complaint and is herein entitled to relief under 42 U.S.C. §1983.

334.    Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages in an amount of not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

## COUNT 4:
### Violation of Civil Rights Pursuant to Title 42 U.S.C. §1983
### (Municipal Liability)

335.    Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

336.    On May 5, 2017, Mr. Sanders was an arrestee/detainee at the MCDC, where he came under the care, custody, and control of Defendant, during which time, and at all times, he was in serious need of care, including mental health care, a fact which Defendant, through its agents and employees knew.

337.    Defendant Mississippi County has a continuing, widespread, and persistent pattern of unconstitutional misconduct by its officers.

338.    Defendant Mississippi County and its policymakers have notice of the unconstitutional misconduct and demonstrate a deliberate indifference to or tacit authorization of such unconstitutional misconduct.

339.    Defendant Mississippi County has a custom of failing to identify the need for medical care, failing to provide medical care, and ignoring clear signs of mental illness.

340.    Defendant Mississippi County has a custom of using excessive force and permitting and authorized others to use excessive force in its officer's presence.

341.    Upon information and belief, Defendant Hutcheson as Sheriff and/or Defendant Yanez as Jail Administrator, are the highest-ranking officials, had direct management supervision over the MCDC staff and was responsible for setting and implementing policy with respect to the MCDC. In the alternative, Defendants Hutcheson and Yanez were inadequately trained and supervised by Defendant Mississippi County.

342.    Defendant Mississippi County via Defendants Hutcheson and Yanez failed to train, supervise, and retain MCDC staff, including Defendants Hill, Ross, Maldonado, McGlothlin, and Altamirano and failed to supervise in a manner which deprived Mr. Sanders of his constitutional rights.

343.    Defendant Hutcheson instructed County Defendants and City Defendants to charge into Mr. Sanders' holding cell and use excessive force against Mr. Sanders, even though he was unarmed and non-threatening.

344.    These customs exhibit a deliberate indifference to the constitutional rights of detainees/inmates, including Mr. Sanders.

345.     Since 2010, there have been at least five other occasions in which it was alleged that Defendant Mississippi County and MCDC jailers failed to provide medical care or used excessive force on an inmate.

346.     In April 2010, an inmate alleged that after he was beaten up by other inmates (at the direction of Defendant Hutcheson) and severely injured, MCDC jailers failed to provide medical attention.

347.     In September 2012, an inmate alleged that he was placed in restraints and chained between a bed and the cell door bars for several hours and later he was handcuffed behind his back and placed in shackles on his ankles and TASED causing injury.

348.     In December 2014, a pregnant inmate complained of pregnancy pains and was bleeding, yet Defendant Mississippi County failed to provide medical assistance and the baby was delivered stillborn.

349.     In May 2015, a young lady was detained in a holding cell for driving under the influence of drugs.

350.     It was alleged that the young lady showed signs of severe intoxication, yet MCDC jailers failed to provide medical attention and this failure caused the young lady's death

351.     In May 2017, an inmate alleged that his feet were in pain and that the flesh was falling off his toes and, yet, MCDC jailers failed to provide adequate medical care.

352.     Alternatively, Defendant's failure to have an appropriate policy exhibits a deliberate indifference to the constitutional rights of arrestees/detainees/inmates, including Mr. Sanders.

353.     Defendant Mississippi County developed a Policy and Procedure titled "Access to Medical Care" which is grossly inadequate and ignores constitutional rights.

354.    Said Order states that MCDC personnel will be trained on the recognition of signs and symptoms of mental illness – yet it provides no specific training and, upon information and belief, no MCDC staff has received said training.

355.    Said Order states nothing about specific mental illnesses or psychosis.

356.    Defendant Mississippi County developed a Policy and Procedure titled "Use of Force" which is grossly inadequate and ignores constitutional rights.

357.    These policies violated Mr. Sanders' constitutional rights in failing to provide for his safety.

358.    To the extent these policies are adequate, County Defendants failed to follow their own policies, in that:

a.      They failed to transport Mr. Sanders immediately to the hospital when it was requested by a medical professional.

b.      They failed to use all reasonable efforts to resolve the situation prior to the use of force.

c.      They failed to make every reasonable attempt to generate voluntary compliance.

d.      They used TASERs as a means of punishment.

e.      They failed to use any confrontation avoidance techniques.

f.      Failed to assess the situation to determine the appropriateness of using force.

g.      Failed to contact a health care professional to assess the use of force.

h.      They failed to follow the Use Of Force Team Techniques and failed to have a plan when they entered the holding cell.

i.  In fact, there is no one reason given for entry into the cell as everyone involved stated a different justification for entry.

j.  They failed to make any verbal commands while in the holding cell and attempting to restrain Mr. Sanders.

k.  Mr. Sanders did not pose an immediate threat to the safety of officers or others, he was not involved in a serious crime, and was not attempting to resist arrest or evade arrest.

l.  There was no need for any use of force, thus, the pepper spray should not have been used pursuant to the policy.

m.  Mr. Sanders was not being arrested and thus no force should have been used.

n.  They continued to use force for several minutes even after Mr. Sanders' body was limp and no longer resisting.

o.  They used force techniques that they were not authorized to use or trained in, such as pressure point techniques.

p.  The use of force was not videotaped.

q.  They used force on Mr. Sanders' neck and face which is prohibited.

r.  Any staff member involved in the incident precipitating the need for force must be excluded from the use-of-force team, which was not done here.

s.  Failed to seek the assistance of a mental health or medical professional prior to using immediate-use-of-force.

t.  Used four-point restraints.

u.  Failed to consult medical staff before using pepper spray on Mr. Sanders.

v.     And in other ways which will be discovered during this litigation.

359.    Defendant Hutcheson violated the use of force policy in that a "supervisor shall not participate [in any calculated use of force] except to prevent impeding staff injury."

360.    Upon information and belief, Defendant Mississippi County appointed and/or commissioned officers, who were not a licensed and/or adequately trained medical professionals, to screen the needs, including medical needs of arrestees/detainees in the custody of MCDC.

361.    Defendant Mississippi County also has a custom of using excessive force, including the use of a TASER on unarmed and non-threatening individuals, that have not resulted in a formal complaint being filed.

362.    Defendant Mississippi County employees have deployed TASERs to attempt to calm inmates on several occasions prior to Mr. Sanders' death.

363.    On February 3, 2017 at approximately 10:49 p.m., Defendant Yanez aimed a TASER at an unarmed and non-threatening woman in the MCDC booking area.

364.    Defendant Yanez then forced the woman to the ground, pinned her arm behind the woman's body.

365.    Defendant Altamirano assisted Defendant Yanez and laid on the woman's leg on the ground while the woman was twisted at the waist (much like Mr. Sanders' body).

366.    Defendant Yanez applied pressure to the woman's neck while on the ground while Defendant Altamirano laid on the woman's legs.

367.    Defendant Ross aimed the TASER at the woman while Defendants Yanez and Altamirano use excessive force on the woman.

368.    Defendant Ross then used his hands to pull on the woman's neck and aimed a TASER at her.

369.    The Defendants laid on the woman for approximately 2 minutes and 30 seconds.

370.    After the woman is subdued and crying face down on the ground, Defendant Altamirano picked the woman up by the back of her shirt and pants and tossed her face first onto the floor and then drags her away.

371.    Another MCDC male employee witnessed the incident and did nothing.

372.    On March 15, 2017, at approximately 10:42 a.m., Defendant Altamirano pointed a TASER multiple times in a threatening matter at an unarmed, non-threatening African American man in the booking room.

373.    At approximately 10:46 a.m. she deployed the TASER and the man falls face forward to the floor.

374.    The man was approximately 15 feet away from Defendant Altamirano and was unarmed, standing still, and attempting to shield himself when she deployed the TASER.

375.    A few seconds later Defendant Altamirano rushed toward the man on the ground and deployed the TASER again while the man was on the ground.

376.    Another MCDC male employee witnessed the incident and did nothing.

377.    Nurse Brown also witnessed the event but did nothing.

378.    On March 27, 2018, the Attorney General of Missouri issued a statement in which he noted:

    a.    Mr. Sanders' death was the latest in a series of deaths under troubling circumstances in the Mississippi County Jail in recent years.

    b.    The conduct of the individuals involved raise grave questions about the training and supervision provided.

    c.    The Jailers violated protocol and best practices.

      d.      The AGO continues to investigate the MCDC.

379.    At the time of the above-described series of events it was the custom or policy of Defendant Mississippi County to inadequately supervise and train its jailers with inmates/detainees suffering from mental illness, thereby evidencing a deliberate indifference to Mr. Sanders' constitutional rights.

380.    The need for training MCDC staff on the rights of arrestees/detainees/inmates with mental illness is obvious, and the lack of training was so inadequate that it was likely to result in violating the rights of individuals with mental illnesses, including Mr. Sanders.

381.    The jailers and employees of Defendant Mississippi County conspired with one another and the City Defendants to cover for or protect one another from criminal and/or civil sanctions that might arise from the violation of constitutional rights.

382.    Defendant Mississippi County implicitly or explicitly adopted and implemented policies, customs, or practices that included, among other things, allowing jailers with no or inadequate training to assess the conditions, including the mental conditions and/or withhold medical treatment and/or deny medical treatment to inmates with serious medical needs, including Mr. Sanders, which policies, customs, or practices reflected a deliberate indifference to the serious medical needs of Mr. Sanders.

383.    The failures of Defendant to institute policies and procedures that would provide Mr. Sanders with reasonable access to a properly and/or adequately trained and/or qualified medical provider amounts to deliberate indifference to Mr. Sanders' serious medical needs.

384.    At the time of the above-described series of events it was the custom or policy of Defendant Mississippi County to inadequately supervise and train its corrections officers with

detainees suffering from mental illness, thereby evidencing a deliberate indifference to Mr. Sanders' constitutional rights.

385.   The need for training MCDC staff on the rights of detainees with mental illness is obvious, and the lack of training was so inadequate that it was likely to result in violating the rights of these individuals, including Mr. Sanders.

386.   Defendant Mississippi County's failure to supervise MCDC staff constituted a tacit authorization of the offensive acts.

387.   The jailers and deputies and Sheriff of Defendant Mississippi conspired with one another and the City Defendants to cover for or protect one another from criminal and/or civil sanctions that might arise from the violation of constitutional rights.

388.   In committing the acts complained of herein, Defendants acted under color of State law to show deliberate indifference to a serious medical need and to the substantial risk of death by Mr. Sanders after having actual knowledge of such need for care, including medical care, and in deprivation of Mr. Sanders' rights under the Due Process Clause of the 14th Amendment of the United States Constitution.

389.   As a direct and proximate result of the violation of Mr. Sanders' constitutional rights by the Defendant, Mr. Sanders suffered general and special damages as alleged in the Complaint and is herein entitled to relief under 42 U.S.C. §1983.

390.   Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages in an amount of

not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

### COUNT 5:
### False Imprisonment

391.    Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

392.    Defendants intentionally restrained, detained, and imprisoned Mr. Sanders against his will.

393.    Defendants intentionally confined Mr. Sanders without legal justification.

394.    Defendants thereby caused Mr. Sanders bodily harm.

395.    As a direct and proximate result of Defendants' conduct, Mr. Sanders suffered general and special damages as alleged in the Complaint.

396.    Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages, damages for aggravating circumstances and punitive damages in an amount of not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

## COUNT 6:
## <u>Wrongful Death</u>

397.    Plaintiff incorporates by reference the allegations made in each preceding paragraph as if each were set forth here verbatim.

398.    Defendants owed a duty to ensure the safety of arrestees, inmates and detainees of the MCDC, specifically Mr. Sanders. This duty included the duty to provide adequate medical care and not to use excessive force.

399.    Defendants breached their duty of care in failing to provide adequate medical care; in failing to properly assess and examine Mr. Sanders; in failing to properly monitor Mr. Sanders, and in using excessive force against Mr. Sanders.

400.    Defendants acted in bad faith or with malice, including acting with reckless indifference to the rights of Mr. Sanders, when Defendants, did the following:

a.    Repeatedly used a TASER on Mr. Sanders when he was in the holding cell alone and posed no threat to himself or anyone else;

b.    Used pepper spray on Mr. Sanders when he was in the holding cell alone and posed no threat to himself or anyone else;

c.    Used a TASER to dry stun Mr. Sanders on repeated occasions while in the holding cell;

d.    Used excessive force including punching, kneeing, grabbing, slapping, and hitting Mr. Sanders on repeated occasion while in the holding cell;

e.    Dog piling on Mr. Sanders when he was not resisting;

f.    Directing, allowing, and continuing to apply pressure point techniques after Mr. Sanders' body went limp;

g.  Directing, allowing, and continuing to apply pressure to Mr. Sanders' neck after Mr. Sanders' body went limp;

h.  Refusing to administer life saving treatment after Mr. Sanders' body went limp; and

i.  Other acts which are not now known but which will be discovered during the litigation.

401.   All of these acts led to the death of Mr. Sanders.

402.   Defendants breached their duty of care by failing to remove themselves from the possible zone of danger, call for and await appropriate backup and assistance, or determine that imminent danger or serious physical injury or death existed prior to using excessive force.

403.   As a direct and proximate result of the aforementioned malicious, brutal and outrageous conduct for Defendants, Mr. Sanders died and Plaintiff has been deprived of the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of Mr. Sanders by reason of such death, further including past and future lost income, household services, and the value of benefits which would have been provided by Mr. Sanders. As a further direct and proximate result of the acts of omissions of Defendants, Plaintiff has incurred pecuniary damages, including funeral expenses.

404.   Further, Defendants caused Mr. Sanders to suffer conscious pain, suffering, and loss of life.

405.   That by reason of the foregoing premises, Plaintiff is entitled to recover fair and reasonable damages against the Defendants, and each of them, as provided for in § 537.080 R.S.Mo, for the wrongful injuries to and the wrongful death of Mr. Sanders, including special damages for his funeral and burial.

406.    From the beginning of his encounter with Defendants Matney and Arnold described hereinabove until his untimely death, Mr. Sanders suffered physical and mental pain which is an item of damage to be considered and awarded.

407.    Defendants' actions were wanton, malicious, sadistic, and oppressive and done with a high probability of injury and with reckless indifference to the rights of Mr. Sanders and Plaintiff, thus entitling Plaintiff to an award of aggravating circumstances.

WHEREFORE, Plaintiff prays this Court enter judgment in favor of Plaintiff and against Defendants, and each of them jointly and severally, for compensatory damages, damages for aggravating circumstances and punitive damages in an amount of not less than Twenty Million Dollars ($20,000,000.00); award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and allow such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all of the above issues, costs herein incurred, fees where appropriate, and for such other relief as is deemed appropriate by the Court.

Respectfully submitted,
**WENDT LAW FIRM, P.C.**

*/s/Jessica M. Agnelly*
Samuel M. Wendt      MO#53573
Jessica M. Agnelly      MO#57663
1100 Main Street, Suite 2610
Kansas City, MO 64105
Phone: (816) 531-4415
Fax: (816) 531-2507
E-mail: jessica@wendtlaw.com

and

Michael G. Hoskins, *pro hac vice* (pending)
LAW OFFICE OF MICHAEL G. HOSKINS, P.C.
3200 West End Avenue, Suite 500
Nashville, TN 37203
Phone: (615) 783 - 1757
Fax: (615) 866 - 5816
Email: mgh@michaelghoskins.com


***ATTORNEYS FOR PLAINTIFF***
***QUINTA SANDERS***