**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **QUINTA SANDERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:18-cv-00269-ACL** |
| **v.** | ) | |
| | ) | |
| **Mississippi County, Missouri, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

**COMES NOW** Plaintiff by and through counsel and states:

1.      On May 5, 2017, Plaintiff's son, Tory Sanders, was killed while on a protective hold in the Mississippi County, Missouri Detention Center ("MCDC").

2.      Mr. Sanders was killed after an altercation with ten jailers and police officers, including the Mississippi County sheriff at that time, Cory Hutcheson, inside of Holding Room 120.

3.      At 7:35 p.m., Mr. Sanders' body was removed from the room and transported to the hospital where he was pronounced dead at 8:09 p.m.

4.      Holding Room 120 is roughly ten-foot-long and ten-foot-wide with a concrete bunk and a steel commode. (Hutcheson 1/15/20 Dep. at p. 70:8-9, attached hereto as Exhibit A)

5.      Holding Room 120 does not have a surveillance camera inside of the room. (Yanez Dep. at p. 172:7-25, attached hereto as Exhibit B)

6.      However, there is a surveillance camera referred to as Camera 1 located directly outside of Holding Room 120, which captures its door and a portion of its interior.

1

(See "Location of Camera 1" attached hereto as Exhibit C and "View from the Missing Camera Footage, Camera 1" attached hereto as Exhibit D).

7.      Camera 1 is the only camera that would have captured the events leading up to the death of Mr. Sanders. It is the only camera that would have definitively proven that the Defendants never attempted to release Mr. Sanders and, thus, proved the false imprisonment claim.  It is very likely that it would have showed Mr. Sanders' head and neck while he was laying on the ground, which is very important because Plaintiff alleges that Defendant Hutcheson had his knee on Mr. Sanders' neck, which led to his death.

8.      Camera 1 was operational and recording on May 5, 2017. (Exhibit A at p. 153:9 - 155:21). However, the footage was removed from the digital video recorders (DVRs) prior to being turned over to investigators at the Missouri Highway Patrol.

9.      At all times relevant, Defendant Mississippi County, Missouri, and Defendant Sheriff Hutcheson, had complete and exclusive control over the DVRs which stored the surveillance footage from all of the MCDC cameras, including Camera 1.

10.     Pursuant to Mo.Rev.Stat. § 221.020, "the sheriff of each county in this state shall have the custody, rule, keeping and charge of the jail within his county, and of all the prisoners in such jail, and may appoint a jailer under him, for whose conduct he shall be responsible."

11.     Almost two hours after Mr. Sanders' body had been removed from the jail, a formal request to investigate the incident was finally[1] made to the Missouri Highway

---

[1] Charleston Department of Public Safety Director Robert Hearnes notified the DDCC because Sheriff Hutcheson refused. (Hearnes Dep. at p. 31:20 – p. 32:14, attached hereto as Exhibit F). Sheriff Hutcheson wanted to do the investigation "in house" and suggested that his employee, Chief Deputy Brandon Caid, conduct the investigation. (Id. at p. 27:11 – p. 30:7) Deputy Caid believed it was a conflict of interest, so he contacted the County Prosecutor for guidance. (Caid Dep. at p. 68:3 – p. 70:22; p. 75:6-14, attached hereto as Exhibit G). The County Prosecutor was in "disbelief" that Hutcheson would ask Deputy Caid to conduct the investigation. Id. Sheriff Hutcheson also asked the new East Prairie Chief of Police Mark Higgins to

Patrol Division of Drug and Crime Control ("DDCC"). (MHP Original Report – Initiation of Investigation, attached hereto as Exhibit E).

12.     At 10:43 p.m., Corporal N.H. McDaniel, Lieutenant P.E. Gregory, and Trooper M.B. Foster of the DDCC arrived at the jail to begin their investigation. (MHP Supp. Rep. #2, at ¶2, attached hereto as Exhibit H)

13.     Sheriff Hutcheson reviewed about 20 to 30 minutes of the surveillance video from Camera 1 and Camera 5 with Trooper Foster on the night of May 5. (Exhibit A at p. 153:9 – 155:21; 156:2-8). Camera 5 is located at the opposite end of the hallway from Camera 1 and does not capture the holding room door or inside the holding room.

14.     Thereafter, Trooper Foster said "he needed all" the footage from Cameras 1 and 5. (Exhibit A at p. 156:12-18).

15.     At 1:05 a.m. on May 6, Sheriff Hutcheson provided Corporal McDaniel a USB flash drive that _allegedly_ contained surveillance footage of the incident. (Exhibit H at ¶7).

16.     Despite the request for "all" footage from Cameras 1 and 5, and unbeknownst to the DDCC, Sheriff Hutcheson did not include any footage from Camera 1 on this USB flash drive and only included two hours of footage from two other cameras. (Exhibit A at p. 157:10-21; Exhibit H).

17.     Corporal McDaniel asked Sheriff Hutcheson what footage he had previously provided to Trooper Foster and Hutcheson replied, "I provided the footage that I intended for him to have." (Exhibit H at ¶7).

---

conduct the investigation, but he stated that he did not feel comfortable doing it. Id. at p. 71:13-21; p. 76:1 – p. 77:8).

18.     In response, Corporal McDaniel asked Sheriff Hutcheson for the complete surveillance footage from the time Mr. Sanders arrived at the jail until his body was removed, and Sheriff Hutcheson said he would provide it two days later on Monday, May 8. (Exhibit H at ¶7).

19.     On May 9, Sheriff Hutcheson was served with a Preliminary Order in Quo Warranto, enjoining him from engaging in any activity or exercising any authority as sheriff and he was not permitted to return to MCDC. (See Preliminary Order in Quo Warranto, attached hereto as Exhibit I).

20.     During his deposition in this case, Sheriff Hutcheson admitted that he does not remember if he ever actually downloaded footage for Camera 1 footage for the Missouri Highway Patrol. (Exhibit A at p. 158:1-12).

21.     On May 9, Corporal McDaniel received a second copy of surveillance footage from Deputy Branden Caid. (MHP Supp. Rep. #27 at ¶2, attached hereto as Exhibit J).

22.     The footage started from time Mr. Sanders entered the jail and recorded the events until 11:00 p.m. on May 5, but was only for Camera 5, the booking camera, and the parking lot camera. It did not include any footage from Camera 1.  (Exhibit J).

23.     On May 18, Corporal McDaniel seized the three DVRs which were supposed to contain footage from all MCDC surveillance cameras, as evidence. (MHP Supp. Rep. #32 at ¶2, attached hereto as Exhibit K).

24.     On August 1, Missouri Highway Patrol Sergeant J.A. Pragman examined the three DVRs and found that for two DVRs, the earliest date available for extraction was May 7, two days after Mr. Sanders was killed. (MHP Supp. Rep. #35 at ¶¶ 2.Q2; 2.Q3

and 3.Q2; 3.Q3, attached hereto as Exhibit L). The footage for the days before May 7 were not on the DVR. The third DVR had an inaccurate time stamp and the forensic software was unable to read the device. (Exhibit L at ¶¶ 2.Q4 and 3.Q4).

25.    The DVRs are kept in the control room with a redundant backup located in the jail administrator's office. (Exhibit A at p. 149:23-150:23; 160:22-161:2).

26.    Video footage from Camera 1 and Camera 5 are kept on separate DVRs. (Exhibit A at p. 156:20-157:1).

27.    Jailers in the control room could view the surveillance footage, but they could not make any administrative changes to the footage. (Exhibit A 159:25-160:11).

28.    The DVRs are password protected and Sheriff Hutcheson was the only person who could download footage from the DVRs. (Hutcheson Nov. 15, 2017 Dep. at p. 63:9-25, attached as Exhibit M.)

29.    Individualized video footage could not be deleted from the DVRs. (Exhibit M at p. 64:1-3).

30.    In order to delete any footage, you had to erase the whole hard drive. (Exhibit M).

31.    Sheriff Hutcheson had the ability to access the DVRs remotely from his work computer and download videos. (Exhibit M at p. 64:10-23).

32.    Sheriff Hutcheson stated that there might be a written policy that requires the automatic retention of surveillance when there is a death or injury in the jail. (Exhibit M at p. 65:15-19).

33.     Sheriff Hutcheson stated that even without a retention policy it "logical" that the jail would automatically retain surveillance when there is a death or injury in the jail. (Exhibit M at p. 65:15-20).

34.     In order for relief for spoliation to be awarded, a district court is required to make two findings: "(1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party." *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 879 (8th Cir. 2015).; *see also Hallmark v. Murley,* 703 F.3d 456, 460 (8th Cir. 2013).

35.     "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007); *see also Morris v. Union Pac. R.R.,* 373 F.3d 896, 902 (8th Cir.2004).

36.     To find prejudice, the despoiled evidence must have been both relevant and must not be available to the moving party through other sources. *Koons v. Aventis Pharm., Inc.,* 367 F.3d 768, 780 (8th Cir.2004).

37.     District courts have discretionary power to fashion an appropriate sanction for conduct that abuses the judicial process. *Taylor v. Null*, 2019 WL 4673426, at *4 (E.D. Mo. 2019)(slip copy). Sanctions against an offending party for spoliation include entry of default judgment, an adverse inference jury instruction, exclusion of evidence, and the imposition of the prejudiced party's attorneys' fees or other monetary sanction. *Am. Builders & Contractors Supply Co., Inc. v. Roofers Mart, Inc.*, 2012 WL 2992627, at *3

(E.D. Mo. July 20, 2012)(unreported); *see also Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 2011 WL 5006220 (E.D.Mo.2011).

38.     In choosing between the available sanctions, the Court "is not constrained to impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances." *Chrysler Corp. v. Carey,* 186 F.3d 1016, 1022 (8th Cir.1999).

39.     The Court may strike pleadings or render default judgment against a party for spoliation of evidence when the party acted in bad faith by engaging in "intentional destruction of evidence indicating a desire to suppress the truth" and the action prejudiced the party seeking the evidence at issue. *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1006-07 (8th Cir. 2006).

40.     From the outset, Defendant Mississippi County took steps to prevent the release of any footage that would have showed the events leading up to Mr. Sanders' death. And, then it intentionally deleted all footage from that day. Over a four-day period, Mississippi County provided the DDCC with two separate "sets" of footage– yet, neither set contained any footage from Camera 1. A forensic evaluation of the DVRs discovered that footage prior to May 7 was no longer there and/or was unreadable. Footage from Camera 1 was the only footage that would have showed the events leading up to Mr. Sanders' death and its destruction was prejudicial to Plaintiff.

41.     These facts establish the elements for the court to find spoliation.

42.     Here, Defendants Mississippi County and Cory Hutcheson acted in bad faith by intentionally destroying the evidence to suppress the truth of what occurred that day. Their pleadings should be stricken.

43.     Plaintiff incorporates her Memorandum In Support of Plaintiff's Motion for Sanctions.

WHEREFORE, Plaintiff prays and Order from the Court entering Sanctions against Defendants Mississippi County, Missouri and Cory Hutcheson, including striking their pleadings, attorneys fees, and costs associated with filing this motion and all other relief the Court finds just and proper.

Respectfully submitted,

WENDT LAW FIRM, P.C.

 /s/Jessica M. Agnelly
Samuel M. Wendt    MO#53573
Jessica M. Agnelly   MO#57663
4717 Grand Avenue, Suite 130
Kansas City, MO 64112
Phone: (816) 531-4415
Fax: (816) 531-2507
E-mail: jessica@wendtlaw.com

          and

Michael G. Hoskins, *pro hac vice*
LAW OFFICE OF MICHAEL G. HOSKINS, P.C.
3200 West End Avenue, Suite 500
Nashville, TN 37203
Phone: (615) 783 - 1757
Fax: (615) 866 - 5816
Email: mgh@michaelghoskins.com
*ATTORNEYS FOR PLAINTIFF*
*QUINTA SANDERS*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 27th day of July 2020, the foregoing document was electronically filed with the Clerk of the Court. Additionally, a copy of said document was mailed electronically, the same date to:

D. Keith Henson
PAULE, CAMAZINE, & BLUMENTHAL, P.C.
165 N. Meramec Ave., Suite 110
Clayton (St. Louis), MO  63105-3772
Telephone: (314)-727-2266
Facsimile: (314)-727-2101
khenson@pcblawfirm.com
ATTORNEYS FOR DEFENDANTS CITY OF CHARLESTON, MISSOURI
ROBERT HEARNES, CURTIS ARNOLD, ZACHARY MATNEY, AUSTIN HENSON

A.M.  Spradling, III
SPRADLING & SPRADLING
1838 Broadway, PO Drawer 1119
Cape Girardeau, MO  63702-1119
Telephone: 573-335-8296
Fax: 573-335-8525
spradlaw@spradlaw3.com
ATTORNEYS FOR DEFENDANTS MISSISSIPPI COUNTY, MISSOURI, SALLY YANEZ, RYAN HILL, JOE ROSS, JOSH MALDONADO, FAITH ALTAMIRANO, AND DECOTA MCGLOTHLIN

Robert T. Plunkert
Peter J. Dunne
PITZER SNODGRASS, P.C.
100 South Fourth Street, Suite 400
St. Louis, MO 63102-1821
314-421-5545
314-421-3411 (fax)
plunkert@pspclaw.com
dunne@pspclaw.com
ATTORNEYS FOR CORY HUTCHESON

    _/s/Jessica M. Agnelly_____
    ATTORNEY FOR PLAINTIFF